## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| LESLIE M. CORNISH, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 13-1140 (RC) |
| | : | | |
| v. | : | Re Document No.: | 11 |
| | : | | |
| DISTRICT OF COLUMBIA, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff Leslie M. Cornish ("Cornish"), an employee at the Superior Court of the District of Columbia (the "Superior Court"), brought this action against the District of Columbia (the "District") alleging violations of numerous statutes, including Title I of the Americans with Disabilities Act of 1990 ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the Equal Pay Act of 1963 ("Equal Pay Act"), and the D.C. Human Rights Act ("DCHRA"). In addition, Cornish asserts common law claims for breach of contract, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligent supervision. The District has moved to dismiss many, but not all, of Cornish's causes of action under Rule 12(b)(6) for failure to state a claim, as well as for summary judgment on the Title VII claims based on failure to exhaust administrative remedies and on various other claims for unliquidated damages based on failure to comply with D.C. Code § 12-309. Upon consideration of the District's motion, and the memoranda in support thereof and opposition thereto, the Court will grant in part and deny in part the motion.

## II. BACKGROUND

### A. Factual Allegations

Cornish is an African-American woman employed at the Superior Court since August 2008. *See* 2d Amend. Compl., ECF No. 8, at ¶¶ 4, 6. She began working as a program specialist in the Superior Court's Paternity and Child Support Branch ("P&S Branch") at a pay grade of JS-11, and in April 2011 she was reassigned to the Superior Court's Budget and Finance Division, which is the position she currently holds. *See id.* ¶ 6. Sherry Coppet ("Coppet") and Delores Henderson ("Henderson"), both of whom are African-American, were employees in the P&S Branch during Cornish's tenure with the department. *See id.* ¶ 7. Coppet was the P&S Branch chief during the relevant period, and from August 2008 to March 2011 she served as Cornish's immediate supervisor. *See id.* ¶¶ 7-8. During that same period, Henderson served as an Intake/Calendar Section supervisor, a position subordinate in rank to that of Cornish. *See id.* ¶ 8. In March 2011, Henderson was promoted to P&S Branch supervisor, making her Cornish's immediate supervisor. *See id.* ¶ 9.

#### 1. Allegations of Harassment and Discrimination in the P&S Branch

Cornish alleges that she suffered "innumerable acts of often shocking hostility and degrading treatment" while working in the P&S Branch. *See id.* ¶ 10. In particular, Cornish alleges that the hostility began during her initial interview for a position in the P&S Branch, when a clerk at the front desk told her that she "wasn't going to make it" in the department because she was "too pretty" and dressed too nicely for Coppet's liking. *Id.* ¶ 11. The clerk's forewarning soon bore itself out through repeated "derogatory comments" from Coppet and Henderson about Cornish's "conventionally feminine appearance and carefully coordinated apparel," which Cornish alleges were made because the women "resented her deviation from

what they considered conforming dress and personal appearance for an African American woman." *Id.* ¶ 12. For example, a co-worker once overheard Henderson compliment Cornish on her appearance and then comment behind Cornish's back, "Oh, she thinks she's so cute." *Id.* ¶ 13. And sometimes when other people complimented Cornish, Coppet and Henderson would go into what one co-worker called "hater mode," which was when they ordered co-workers not to give Cornish any compliments. *See id.*

Coppet and Henderson disparaged Cornish for being from Baltimore, Maryland, by playing on the alleged stereotype held by African-American women from Washington, D.C. about African-American women from Baltimore being prone to crude and violent behavior. *See id.* ¶ 14. For instance, one time after Cornish wished Coppet a "good morning," Coppet reacted by "feign[ing] a dramatic, apprehensive reaction," and saying that she thought Cornish was "going to hit me or something." *Id.* On another occasion, Henderson remarked, "We almost forced out the Baltimore in her," after a meeting in which Henderson and Coppet had "harassed and bullied" Cornish into becoming "flustered and agitated." *Id.*

The behavior of Coppet and Henderson allegedly became increasingly more hostile over time, and they frequently insulted, humiliated, and intimidated Cornish in front of co-workers. *See id.* ¶¶ 15-16. For instance, Henderson called Cornish by her first name rather than using "Mr." or "Ms." like she did for other co-workers. *See id.* ¶ 18. In addition, Henderson, allegedly with Coppet's encouragement, would question or countermand the directions Cornish gave to other employees, and Henderson would order Cornish to complete certain assignments even though her position and pay grade were below Cornish's. *See id.* ¶ 20. Together, Henderson and Coppet also regularly forced Cornish to perform tasks below her pay grade, such as administrative and clerical duties, while they "giggl[ed]" and "snicker[ed]" when Cornish was

instructed on these tasks by lower-ranked employees.  *See id.* ¶ 21.  On other occasions, the two

women forced Cornish to stay beyond the time she was supposed to leave by giving assignments

with arbitrary deadlines, often for that same night or the next morning.  *See id.* ¶ 22.

The events around Thanksgiving 2010 provide an example of what Cornish allegedly

endured at work.  On Wednesday, November 24, 2010, the day before Thanksgiving and hours

after Cornish's co-workers had left under a grant of early dismissal, Cornish was forced to

continue working to finish a project Coppet had assigned to her late that afternoon.  *See id.* ¶ 24.

While Cornish worked, Coppet walked by and said "good night" before turning off the office

lights.  *See id.*  Later that night, a co-worker found Cornish sitting at her darkened workstation

"extremely shaken and in severe distress."  *Id.*  In the early hours of the next morning, Cornish

awoke at home to discover that she had suffered a stroke while sleeping.  *See id.* ¶ 25.  The

stroke left Cornish partially paralyzed, able to take steps only to the left, and with limited speech

abilities.  *See id.*  Cornish alleges that "the extreme stress and constant psychic shocks and insults

of her mistreatment at work directly or indirectly precipitated her stroke."  *Id.*  In the months

after the stroke, Cornish walked with a limp that sometimes required her to use a cane, had

difficulty walking up and down stairs, had limpness in her hands, had slurred speech, and

suffered bouts of dizziness and fatigue.  *See id.* ¶ 27.

Cornish returned following the stroke in January 2011 as a part-time employee in the

P&S Branch, and then as a full-time employee in February 2011.  *See id*. ¶ 26.  On her first day

back, Cornish found her workstation and desk piled high with so much uncompleted work that

she could barely sit.  *See id.* ¶ 29.  A Superior Court employee eventually had to ask co-workers

to remove some of the piles from Cornish's desk because she could not physically manage the

heavy lifting required to clear the workspace.  *See id.* ¶ 30.  On her second day of work,

Henderson remarked to co-workers within earshot of Cornish, "Look at the way she's limping," and Henderson later asked Cornish, "Why [do] you walk like that?" *Id.* ¶ 31. Co-workers also observed Coppet and Henderson laughing at Cornish and mimicking how she struggled to walk after the stroke. *See id.* At other times, Coppet ordered Cornish to perform routine errands on foot despite her physical disabilities. *See id.* ¶ 33. Cornish alleges that in addition to demeaning her, these errands were imposed to prevent her from leaving work for medical appointments, and on some days Cornish's co-workers carried her personal belongings to meet her elsewhere in the courthouse so as to spare her the struggle of walking back to the office before leaving. *Id.* ¶ 34.

In early 2011, a supervisory position in the P&S Branch became open, but Cornish was passed over in favor of Henderson, despite Cornish being more senior in rank and scoring higher on the required diagnostic tests. *See id.* ¶ 35. Coppet was on the three-person selection panel for this position, and she gave Cornish a "much lower overall score" than did the other two panel members, though Cornish still emerged with the highest total score. *See id.* ¶ 36. When challenged about her biased opinion of Cornish during panel deliberations, Coppet allegedly said that "the consensus score is whatever I say it is because the person is working for me," and "I don't care what y'all say." *Id.* ¶ 37. Toni Gore, another member of the selection panel, reported Coppet's attitude toward Cornish to Dianne King, who was Coppet's supervisor, but no remedial action was taken. *See id.* ¶ 38. In the end, Coppet recommended Henderson for the position without notifying Gore or providing her an opportunity to comment. *See id.*

In the meantime, Coppet and Henderson continued to harass Cornish by, for example, calling a meeting late in the day on April 12, 2011, so Cornish had to miss a physical therapy appointment, despite her prior requests for permission to leave on time that day. *See id.* ¶ 39. A couple days later, Cornish allegedly became so ill because of further harassment from Coppet

and Henderson that she visited the Superior Court's health unit, where she reported symptoms of weakness, dizziness, and uncontrollable shaking similar to what she suffered the morning after the stroke. *See id.* ¶ 41. The nurse on duty advised Cornish that each time co-workers made her feel this way, she should return to the health unit to document the mistreatment and its effect on her well-being. *See id.* The next day, Cornish's treating physician recommended through a written prescription that she transfer to a different workplace environment, have her workload reduced, or otherwise have her workplace stress relieved or mitigated given the ongoing symptoms. *See id.* ¶ 42. Upon returning to work on April 19, 2011, Cornish showed the prescription to Coppet, who responded by "berat[ing]" Cornish and claiming that the prescription was "unintelligible." *See id.* ¶ 43. At a meeting later that day with Coppet and Henderson, Cornish was informed that a transfer and workload reduction "would not happen," and instead, Cornish was ordered to register for the Superior Court's "emotional intelligence" course. *Id.*

On April 20, 2011, Cornish met with the Superior Court's ADA officer, H. Clifton Grandy. *See id.* ¶ 44. As she explained her experiences to Grandy, Cornish began shaking and crying, and Grandy asked if she needed medical attention. *See id.* ¶ 45. Cornish explained that these were the stress-related symptoms regularly caused by her workplace conditions. *See id.* After the meeting, Grandy called Herbert L. Jackson, the Superior Court's Equal Employment Opportunity ("EEO") officer, and urged him to meet with Cornish. *See id.* Cornish and Jackson soon met, and Cornish filed a D.C. Courts EEO complaint alleging that Coppet and Henderson had "harassed, intimidated, bullied, emotionally abused, and discriminated against her based on disability and personal appearance, throughout her tenure at the P&S Branch." *See id.* ¶ 46. Cornish then was placed on one week's paid administrative leave. *See id.* ¶ 47.

2. Temporary Transfer to the Budget and Finance Division

On April 27, 2011, Cornish described her workplace harassment in a meeting with Duane Delaney, the Clerk of the Superior Court. *See id.* ¶ 48. Delaney decided to place Cornish on "a special temporary work assignment" in the Budget and Finance Division under Section 360 of the District of Columbia Courts' Comprehensive Personnel Policies ("D.C. Courts' personnel policy"). *See id.* Delaney informed Cornish that the assignment would last for three months so as to coincide with the expected duration of the investigation into Coppet and Henderson. *See id.* ¶ 57. In her position at the Budget and Finance Division, Cornish performed the duties of a "reconciliation specialist," which is the person responsible for analyzing Superior Court financial records and reconciling them with the U.S. Treasury Department's general ledger and with records of the U.S. General Services Administration. *See id.* ¶ 49.

Cornish's salary remained at the JS-11 pay grade following her assignment to the Budget and Finance Division. *See id.* ¶ 51. She alleges, however, that male employees in the division who perform equal or less complex duties have been compensated at "one or two higher pay grades." *See id.* ¶ 49. Specifically, Cornish alleges that she performs many of the same duties as two male employees, both of whom are accounting officers at the JS-13 pay grade, as well as some of the same duties as another male reconciliation specialist who is a JS-12 employee. *See id.* ¶ 50. Further, Cornish works in the Reporting and Controls Branch of the Budget and Finance Division, where she is a "full participant in the working unit and is subject to the same performance assessments as every other worker there, including annual and semi-annual performance evaluations" in which she has consistently received high ratings despite being afforded less training opportunities than co-workers. *See id.* ¶ 52.

At the end of her first three months in the division, Cornish approached Dana Friend, head of the Budget and Finance Division and the Superior Court's chief financial officer, about ending the temporary assignment and the possibility of a permanent transfer to the Budget and Finance Division. *See id.* ¶ 58. But Friend informed Cornish that Delaney had decided to continue the detail for three more months. *See id.* Around April 24, 2012, Cornish contacted Hamer Legette, the deputy chief of the Budget and Finance Division and deputy chief financial officer of the Superior Court, about formally converting to permanent status, obtaining training and advancement opportunities, and receiving a salary increase.[1] *See id.* ¶ 53. Legette said he was unaware that Cornish's pay grade was JS-11 because she performed JS-13-level tasks, and he assured her that he would "take care of" the salary issue. *See id.* ¶ 54. The next morning, Cornish informed Friend about her conversation with Legette. *See id.* ¶ 55. Later that day, Friend and Valerie Young, Cornish's immediate supervisor in the division, met with Cornish about her salary inquiries. *See id.* At the meeting, Friend reported that Delaney would not end Cornish's Budget and Finance Division assignment and would not offer a pay increase. *See id.* Delaney did, however, authorize Cornish to attend the training sessions offered to co-workers. *See id.* ¶ 56. At the time of filing suit, which was more than two years after the assignment began, Cornish still remained in the Budget and Finance Division, and she had not received a pay grade adjustment. *See id.* ¶ 59.

Finally, Cornish alleges that she continues to suffer "permanent psychic and emotional scars" from the harassment Coppet and Henderson inflicted on her. *See id.* ¶ 61. For instance, prior to the alleged abuse, Cornish did not suffer severe headaches and did not have trouble

---

[1]     Cornish alleges that this meeting occurred in April 2013, *see* 2d Amend. Compl., ECF No. 8, at ¶ 53, but subsequent paragraphs suggest that it actually happened in April 2012. *See id.* ¶ 55. The exact date, however, is largely irrelevant for purposes of resolving the District's motion.

sleeping, yet now she has frequent migraines, chronic insomnia, and recurring nightmares about her experience in the P&S Branch, as well as "bouts of shaking and shivering, weakness in her arms, hands, legs and feet, and other symptoms of post-traumatic stress." *See id.* Further, Cornish allegedly "remains frightened and intimidated at the prospect of crossing paths with" Coppet and Henderson inside the Superior Court. *See id.* ¶ 62.

### 3. December 2009 Superior Court Internal Investigation

In December 2009, Dianne King, director of the Superior Court's Family Court Division, undertook an investigation into allegations of misconduct by Coppet and Henderson. *See id.* ¶ 64. Cornish alleges that the goal of this investigation was to inform Delaney about the basis of various complaints concerning Coppet and Henderson, as well as to determine whether Coppet was fit for a promotion to the P&S Branch chief position. *See id.*

Although King and Coppet had a "close personal relationship," *see id.* ¶ 65, the investigation uncovered, among other things, that "[o]verall, the deputy clerks in the branch allege that Ms. Henderson and Ms. Coppet exhibit disrespectful, loud, harsh and unprofessional communication towards the staff. Further, they exert intimidating, degrading, hostile, humiliating and aggressive behavior when interacting with staff." *Id.* ¶ 66. The investigation also found that Coppet and Henderson "exhibit workplace bullying in the forms of verbal abuse, unfair treatment, public humiliation and criticism, to name a few." *Id.* As a result, the report concluded that Coppet and Henderson should "receive training in interpersonal skills, emotional intelligence, human resources, supervisory practices, and personnel policies" — but no training or disciplinary action ever was taken. *See id.* ¶ 67. In fact, Coppet was promoted despite the findings of the investigation. *See id.*

4.  EEO Office Investigations

Separately, the Superior Court's EEO Office ordered two external investigations into the

allegations in the administrative complaint Cornish filed with Jackson, the Superior Court's EEO

officer.  *See id.* ¶ 68.  The first investigation was conducted by DSZ & Associates and lasted

from June 16 to July 10, 2011.  *See id.* ¶ 69.  DSZ was charged with looking into

> [w]hether the Aggrieved [Cornish] is being subjected to disparate treatment and
> [was] subsequently [*i.e.*, after the stroke in November 2010] subjected to
> discrimination based on her disability at the hands of Sherry Coppet and Delores
> Henderson, both of whom allegedly subjected the Aggrieved to hostile,
> demeaning, rude, disrespectful, and intimidating behavior commencing in 2008,
> and continuing to present.

*Id.* ¶ 69.  On August 5, 2011, the EEO Office issued the first Report of Investigation ("ROI")

summarizing the investigation's findings.  *See id.* ¶ 70.  The ROI contained several sworn

statements by P&S Branch employees, as well as factual findings that supported Cornish's

allegations of harassment.  *See id.*

Cornish explains, however, that the EEO Office "apparently found the first EEO

investigation lacking or insufficient" because some of Coppet's and Henderson's "subordinates

had not been candid as witnesses while those two women were their superiors."  *Id.* ¶ 71.  As a

result, in October 2011 the EEO Office issued a Notice of Acceptance for a second investigation

to address the following questions:

> Issue 1: Whether Complainant is being subjected to disparate treatment and
> subsequently (to November 2010) subjected to discrimination based on her
> disability at the hands of Sherry Coppet and Delores Henderson, both of whom
> allegedly subjected Complainant to hostile, demeaning, rude, disrespectful,
> intimidating, and bullying behavior commencing in 2008, and continuing to
> present.
>
> Issue 2: Whether Complainant was subjected to discrimination based on personal
> appearance and disability or subjected to disparate treatment, when during the
> interview process for the position of Support Branch Supervisor, she was treated
> unfairly and, subsequently, not promoted to that supervisory position.

*Id.* ¶ 71.  On April 26, 2012, the EEO Office issued a second ROI.  Like the first report, the second ROI contained detailed accounts of how Coppet and Henderson "harassed, intimidated, bullied and abused" Cornish, and "discriminated against [Cornish] and subjected her to a hostile work environment, first because of her personal appearance, in particular the professionally poised, decorous, well-groomed and traditionally feminine way she presented herself, and later because of the physical disabilities" following the stroke.  *Id.* ¶¶ 72-73.

The two ROIs also contained evidence that Coppet had arbitrarily assigned Cornish tasks which required her to walk long distances even though she struggled to walk after the stroke, as well as evidence that Coppet and Henderson repeatedly "humiliated" and "berated" Cornish at work, both before and after the stroke.  *See id.* ¶¶ 74-75.  Finally, the reports included statements showing that Superior Court management had "failed to take corrective action" when alerted multiple times over a period of years about the hostile work environment Coppet and Henderson had created within the P&S Branch.  *See id.* ¶ 77.

On August 10, 2012, Cornish received an "EEO Formal Investigation Complaint Finding and Determination" letter written by Jackson.  *See id.* ¶ 78.  The letter found that "[c]onsidering the entire evidence record and the witness testimony … Ms. Coppet and Ms. Henderson did use their position and actual (or apparent) authority to habitually harass, intimidate, and bully [Cornish]."  *Id.* ¶ 79.  In regard to other Superior Court supervisors, the EEO letter found "significant evidence that the division officials knew or should have known of this behavior for quite a while and provided no significant remedy."  *Id.* ¶ 80.  Finally, the EEO letter urged the D.C. Courts to "take seriously complaints about supervisors' (and higher level officials') unprofessional behavior in [managing] subordinate staff," endorsed "appropriate disciplinary action against" Coppet's and Henderson's "unwarranted behaviors," and recommended that the

Superior Court "provide the appropriate remedy" to Cornish. *Id.* ¶ 81. Cornish alleges, however, that the Superior Court has failed to provide her with any remedy despite these findings. *See id.* ¶ 82. In particular, Cornish remains on "temporary assignment" in the Budget and Finance Division at the same pay grade, while Coppet and Henderson have gone unpunished. *Id.*

## B. The Lawsuit

On August 8, 2013, Cornish filed a second amended complaint that contains twelve causes of action against the District for violations of multiple federal and state laws. In particular, Cornish asserts claims under Title I of the ADA and Section 504 of the Rehabilitation Act for hostile work environment (Count I), failure to accommodate (Count II), and disparate treatment (Count III) on the basis of disability. The complaint also includes claims under Title VII for hostile work environment (Count IV) and disparate treatment (Count V) on the basis of race and sex, and a claim for violation of the Equal Pay Act (Count VI). In addition, Cornish asserts claims under the DCHRA for hostile work environment (Count VII) and disparate treatment (Count VIII) based on personal appearance. Finally, she alleges state law claims for breach of contract (Count IX), intentional infliction of emotional distress (Count X), negligent infliction of emotional distress (Count XI), and negligent supervision (Count XII).

Now before the Court is the District's motion to dismiss many of Cornish's claims, as well as for summary judgment on several others. *See generally* Def.'s Mem. Supp. Mot. Dismiss, ECF No. 11. Through this motion, the District seeks the following relief: dismissal of the Title VII claims in Counts IV and V for failure to state a claim and, alternatively, for summary judgment on those claims for failure to exhaust administrative remedies; dismissal of the Equal Pay Act claim in Count VI for failure to state a claim; dismissal of the DCHRA claims

in Counts VII and VII on the basis that the statute does not apply to Superior Court employees; dismissal of the claims for breach of contract in Count IX, negligent infliction of emotional distress in Count XI, and negligent supervision in Count XII for failure to state a claim; and summary judgment on the claims for unliquidated damages in Counts VII-VIII and X-XII for failure to comply with the six-month notice requirement in D.C. Code § 12-309.[2]

## III.  LEGAL STANDARDS

### A.  Rule 12(b)(6) Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must contain sufficient factual allegations, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  When performing this analysis, a court must "accept as true all of the factual allegations contained in the complaint and draw all inferences in favor of the nonmoving party." *Autor v. Pritzker*, 740 F.3d 176, 179 (D.C. Cir. 2014).  But a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  Although a court generally cannot consider matters beyond the pleadings, it may consider

---

[2]     The District originally also moved to dismiss the ADA claims in Counts I-III and the Title VII claims in Counts IV-V as time-barred, as well as the Rehabilitation Act claims in Counts I-III for lack of subject matter jurisdiction.  *See generally* Def.'s Mem. Supp. Mot. Dismiss, ECF No. 11.  The District, however, withdrew its arguments as to these issues in its reply brief, while preserving the right to seek summary judgment on the claims later.  *See* Def.'s Reply Supp. Mot. Dismiss, ECF No. 22, at 1 n.1.

"documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss[.]" *See Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (internal citations and quotation marks omitted).

## B. Rule 56 Motion for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and [thus] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord. Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When Rule 56 is invoked, the moving party has the initial burden of demonstrating the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the moving party does not bear the burden of persuasion at trial, its burden "may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Once the moving party has met its burden, to defeat the motion the nonmoving party must designate "specific facts showing that there is a genuine issue for trial." *Id*. at 324 (citation omitted). Although the Court must view this evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *see Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 23-24 (D.C. Cir. 2013), the nonmoving party

must show more than "[t]he mere existence of a scintilla of evidence in support of" his position — "there must be evidence on which the jury could reasonably find for [the nonmoving party]." *Anderson*, 477 U.S. at 252. Moreover, the nonmoving party "may not rest upon mere allegation or denials of his pleading but must present affirmative evidence showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal citation and quotation marks omitted).

## IV. ANALYSIS

For the reasons discussed below, the Court grants in part and denies in part the District's motion. Specifically, the Court grants summary judgment to the District on the Title VII race and sex discrimination claims because Cornish failed to exhaust the administrative remedies before filing suit. The Court, however, denies the District's Rule 12(b)(6) motion to dismiss the Equal Pay Act claim in Count VI, but the Court grants the District's motion to dismiss the breach of contract claim in Count IX and the negligent infliction of emotional distress claim in Count XI. Next, the Court grants the District's motion to dismiss the DCHRA claims in Counts VII and VIII because the statute does not apply to Superior Court employees. Finally, the Court grants summary judgment to the District on the unliquidated damages claims for intentional infliction of emotional distress in Count X, negligent infliction of emotional distress in Count XI, and negligent supervision in Count XII because Cornish failed to provide timely notice in accordance with D.C. Code § 12-309.

### A. Counts IV and V: Summary Judgment for Failure to Exhaust Title VII Administrative Remedies

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The

District moves for summary judgment on the Title VII claims in Counts IV and V on the basis

that Cornish failed to exhaust the administrative remedies for race and sex discrimination. *See*

Def.'s Mem. Supp. Mot. Dismiss, ECF No. 11, at 22. Specifically, the District argues that in her

complaint with the EEO Office for the D.C. Courts, Cornish selected only the box for

discrimination based on disability and left blank the boxes for race and sex discrimination. *See*

*id.* at 23; *see also* EEO Office Complaint, ECF No. 11-2, Ex. 2 at 10. In addition, the District

argues that Cornish's EEO complaint and subsequent Equal Employment Opportunity

Commission ("EEOC") charge mentioned only "disability," "appearance," and "place of

residence" discrimination as the bases for her claims, not race or sex discrimination. In response,

Cornish argues that sex discrimination can be inferred from the fact that Coppet and Henderson,

both females, harassed other female employees, and race discrimination can be inferred because

remarks about Cornish's personal appearance actually were based on a stereotype about African-

American women from Baltimore. *See* Pl.'s Mem. Opp'n Mot. Dismiss, ECF No. 19, at 27-29.

1. Title VII Administrative Process and Exhaustion

The Title VII statutory scheme requires a plaintiff to exhaust her administrative remedies

before filing a civil action in federal court. *See Robinson-Reeder v. Am. Council on Educ.*, 532

F. Supp. 2d 6, 12 (D.D.C. 2008). "Because untimely exhaustion of administrative remedies is an

affirmative defense, the defendant bears the responsibility of pleading and proving it." *Bowden*

*v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997) (citing *Brown v. Marsh*, 777 F.2d 8, 13

(D.C. Cir. 1985)). The exhaustion of administrative remedies is not a jurisdictional prerequisite

to suit in this Court, but rather "a requirement that, like a statute of limitations, is subject to

waiver, estoppel, and equitable tolling." *Zipes v. Transworld Airlines, Inc.*, 455 U.S. 385, 393

(1982).  In a Title VII case, "[i]t is appropriate to grant a defendant's motion for summary judgment when a plaintiff fails to demonstrate exhaustion of administrative remedies."  *Greer v. O'Neill*, No. CIV.A. 01-1398, 2003 WL 25653036, at *2 (D.D.C. Sept. 25, 2003) (citing *Siegel v. Kreps*, 654 F.2d 773 (D.C. Cir. 1981)).

Requesting exhaustion of Title VII administrative remedies encourages voluntary conciliation and cooperation, and "ensure[s] that the federal courts are burdened only when reasonably necessary."  *Brown*, 777 F.2d at 14.  Thus, a claimant may only assert in federal district court allegations that were contained in the administrative charge or that are "like or reasonably related to the allegations of the charge and growing out of such allegations."  *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (citation omitted).  In other words, claims being asserted in federal court "must arise from 'the administrative investigation that can reasonably be expected to follow the charge of discrimination.'"  *Id.* (quoting *Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981)); *see also Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 69 (D.D.C. 2007) (dismissing claim when the discriminatory act was not mentioned in the administrative charge, was not reasonably related to the allegations in the charge, and was not "within the scope of the administrative investigation that can reasonably be expected to follow" the charge).

Although the boxes on the administrative complaint form "aid a claimant in identifying the nature of her charge, a claimant is not necessarily limited to the boxes she selected if she provides the basis for her claim in her written explanation."  *Robinson-Reeder*, 532 F. Supp. 2d at 13; *see also Maryland v. Sodexho, Inc.*, 474 F. Supp. 2d 160, 162 (D.D.C. 2007) (explaining that "the law does not hold an employee to the use of magic words to make out a proper discrimination charge[,]" but the employee still must "alert the EEOC and the charged employer

with the nature of the alleged wrongdoing").  As such, determining whether Cornish exhausted her Title VII race and sex discrimination claims requires more than merely looking at which boxes she marked on the charge forms.

### 2.  Failure to Exhaust Race and Sex Discrimination Claims

Upon review of the administrative record, the Court finds that Cornish failed to provide notice during the administrative process that she was asserting a claim of race or sex discrimination.  Her allegations of discrimination based on "personal appearance" and the mere mention of Baltimore — as well as related alleged discrimination based "place of residence" and unspecified "stereotypes" in the later EEOC charge — did not reasonably or foreseeably equate to Title VII claims for race or sex discrimination.  *See, e.g.*, EEO Office Complaint, ECF No. 11-2, Ex. 2 at 9-10 (only checking box for disability discrimination);[3] EEO Complaint Finding and Determination, ECF No. 19-11, Ex. 4 at 9 n.11 ("[T]he Complainant's main claim is that she suffered bullying, intimidation, and harassment that manifested in disability, personal appearance, and promotion disparities."); *id*. at 5-11 (discussing only disability and personal appearance discrimination); *id*. at 10 (stating that Cornish "clarified" that the basis for her "personal appearance harassment claim" was Coppet and Henderson "always commenting about how her hair was always done and how her clothes, jewelry and shoes were always well coordinated," and making no reference to race or sex discrimination); *id*. at 12-13 (making no mention of race or sex discrimination in "Finding and Determination" section of EEO report); Cornish EEO State., ECF No. 19-8, Ex. 7 at 2 (stating that "I was more [] afraid of what Ms.

---

[3]     Cornish's EEO complaint form references an attachment that is part of the complaint, but neither Cornish nor the District includes this attachment with their filings.  *See* EEO Office Complaint, ECF No. 11-2, Ex. 2 at 10.  Although theoretically the attachment could provide some basis for finding that Cornish raised sex or race discrimination claims administratively, the Court is comfortable in assuming that Cornish would have included the document as an exhibit to her opposition memorandum if it actually supported her claim.

Coppet and Ms. Henderson could do to me; try to have me terminated, which is what I witnessed them do to another employee who resided in Baltimore," but making no reference to race or sex discrimination); *id.* at 3 ("Ms. Coppet and Ms. Henderson singled me out because of my appearance. They questioned me about how many shoes and suits I owned, how I coordinated my outfits … and how often I got my hair done and wore different hair styles."); Paige EEO Stat., ECF No. 19-9, Ex. 8 at 2 ("I would hear Ms. Henderson talking on the telephone about [Cornish], saying 'Who does she think she is, this girl from Baltimore?'"); *see also* EEOC Charge, ECF No. 19-12, Ex. at 12 at 3-4 (mentioning disability, personal appearance, place of residence, and "stereotype" discrimination, but making no mention of race or sex discrimination).

Similarly, Cornish tries to give undeserved significance to the fact that Coppet and Henderson allegedly harassed multiple female employees within the P&S Brach in addition to Cornish, but some alleged victims being female does nothing to suggest that sex was the basis for the harassment, as opposed to some other, non-protected characteristic, like personal appearance. *See* Pl.'s Mem. Opp'n Mot. Dismiss, ECF No. 19, at 26 (discussing testimony from female employees in the P&S Branch regarding harassment by Coppet and Henderson). Again, Cornish's attempt to offer a post-hoc explanation that was never raised or investigated during the administrative process fails to satisfy the Title VII exhaustion requirement.

Ultimately, Cornish, through her complaint before this Court, attempts to construe the alleged workplace harassment about her fashionable clothing style and her being from Baltimore as race and sex discrimination.[4] *See id.* at 11. But there is no evidence that such a connection

---

[4]     Cornish acknowledges that the alleged stereotype about African-American women from Baltimore is not common knowledge, which undermines her argument that anyone within the administrative process equated her claims with race and sex discrimination. *See* Pl.'s

was explicitly or implicitly made at any time during the administrative process such that it might be said Cornish provided an opportunity for the D.C. Courts EEO Office or the EEOC to investigate race or sex discrimination issues. *See, e.g.*, *Sodexho*, 474 F. Supp. 2d at 162 (finding failure to exhaust when plaintiff "checked only retaliation as the circumstances of the alleged discrimination" and included no other "indication in the EEOC charge of a claim based on religion, harassment, hostile work environment, or any workplace behavior occurring while he was employed"); *Brown v. Dist. of Columbia*, 251 F. Supp. 2d 152, 162 (D.D.C. 2003) (finding failure to exhaust sex discrimination and retaliation claims when plaintiff had "checked only the boxes for allegations of discrimination based on race and disability" and did not otherwise indicate such allegations); *Hunt v. Dist. of Columbia Dep't of Corrs.*, 41 F. Supp. 2d 31, 36 (D.D.C. 1999) (finding failure to exhaust when plaintiff "specifically checked the boxes for age discrimination and retaliation, but she did not check the box for gender discrimination" or otherwise indicate that "she was alleging gender discrimination"); *Sisay v. Greyhound Lines, Inc.*, 34 F. Supp. 2d 59, 64 (D.D.C. 1998) (finding failure to exhaust certain claims when plaintiff "alleged only race discrimination and retaliation in his EEOC charge," but "[a]bsent from that complaint [was] any indication of a claim of national origin discrimination either in the form of express words or factual allegations that would support such a claim").

The Court recognizes that "[n]aturally every detail of the eventual complaint need not be presaged in the [administrative] filing." *Beckham v. Nat'l R.R. Passenger Corp.*, 636 F. Supp. 2d 111, 115 (D.D.C. 2009) (citation and quotation omitted). It also is true, however, that "the substance of … a Title VII claim … must fall within the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Id.* In this instance, the

---

Mem. Opp'n Mot. Dismiss, ECF No. 19, at 4 (describing this stereotype as "dreadfully familiar to the affected local subculture but not widely known outside it").

administrative record, though littered with examples of potential disability and personal appearance discrimination, simply contains no hint of the race and sex discrimination claims Cornish now attempts to bring. References in the investigation about Cornish being from Baltimore or Coppet and Henderson making comments about Cornish's fashion and hairstyle are too vague and too disconnected from the classes of race and sex to constitute notice of the need to investigate discrimination on those specific protected bases. *See, e.g.*, *id.* (finding that "allegations in the Charge Questionnaire [were] too vague and circumscribed to constitute a complaint of a racially discriminatory failure to promote" when plaintiff made no allegation that the employer hired another person into a position for which plaintiff had applied because of racial considerations).

Without even the slightest indication that the prior administrative process reasonably could have recognized the conduct of Coppet and Henderson as potential race or sex discrimination at the time of the proceedings, there was no opportunity to address such claims administratively, as is required before filing suit. Nor was there reason to presume that sex or race discrimination must be investigated: the EEO complaint form mentions both Title VII and the DCHRA, and because personal appearance is a protected category under the DCHRA, the EEO Office was reasonable to understand Cornish as raising a DCHRA personal appearance discrimination claim, rather than discrimination on some other basis also covered by Title VII. *See* EEO Office Complaint, ECF No. 11-2, Ex. 2 at 9.

"[T]he law in this Circuit is clear that an allegation as to one type of discrimination does not exhaust all administrative remedies as to another type of alleged discrimination." *Howard v. Fenty*, 580 F. Supp. 2d 86, 90 (D.D.C. 2008). The Court therefore finds that Cornish failed to exhaust her administrative remedies before bringing the Title VII race and sex discrimination

claims.  Accordingly, the Court grants summary judgment to the District on Counts IV and V.[5]

*See Siegel v. Kreps*, 654 F.2d 773, 776 (D.C. Cir. 1981) (affirming district court's dismissal of plaintiff's religious discrimination claim because it was raised for the first time in the civil complaint and thus was not subject to administrative exhaustion); *Williams v. Spencer*, 883 F. Supp. 2d 165, 174 (D.D.C. 2012) (dismissing Title VII race and color discrimination claim for failure to exhaust when on "the EEOC charge form underlying this action, plaintiff did not check 'race' or 'color' as the basis of her discrimination charge, nor does the written explanation in her EEOC complaint describe a suspicion or allegation of discrimination based on race or color"); *Nyunt v. Tomlinson*, 543 F. Supp. 2d 25, 35-36 (D.D.C. 2008) (dismissing plaintiff's national origin discrimination claim because plaintiff only identified race discrimination and retaliation before the EEOC); *Brown v. Dist. of Columbia*, 251 F. Supp. 2d 152, 162 (D.D.C. 2003) (granting summary judgment for failure to exhaust when "plaintiff checked only the boxes for allegations of discrimination based on race and disability, [] did not check the boxes for gender discrimination or retaliation[,]" and all allegations in the EEOC complaint "related specifically to race and disability discrimination" such that there was "absolutely no indication that plaintiff was alleging gender discrimination or retaliation").

### B.  Count VI: Failure to State a Claim Under the Equal Pay Act

In Count VI, Cornish alleges a violation of the Equal Pay Act, 29 U.S.C. § 206(d), on the basis that she was compensated at a lower pay level than similarly-situated male employees in the Budget and Finance Division.  The Equal Pay Act establishes the "principle of equal pay for equal work regardless of sex," *Corning Glass Works v. Brennan*, 417 U.S. 188, 190 (1974), and Congress's purpose in passing the law was to remedy the "ancient but outmoded belief" that a

---

[5]    Because the Court grants summary judgment on the basis of failure to exhaust, it is unnecessary to address the substance of the Title VII claims.

man should be paid more than a woman for performing the same duties. *Id.* at 195 (internal quotation marks omitted); *see also Goodrich v. Int'l Bhd. of Elec. Workers*, 712 F.2d 1488, 1489-90 (D.C. Cir. 1983) (recognizing the Equal Pay Act as "firmly establish[ing] as federal law the 'principle of equal pay for equal work regardless of sex'" (quoting *Brennan*, 417 U.S. at 190)). As such, the Equal Pay Act "prohibits payment of unequal wages for equal work on grounds of sex, unless the difference is justified by one of four enumerated defenses: a seniority system, a merit system, a system that measures pay by quality or quantity of production, or any other factor not based on sex." *Thompson v. Sawyer*, 678 F.2d 257, 263 (D.C. Cir. 1982) (citing 29 U.S.C. § 206(d)).

To establish a violation of the Equal Pay Act, Cornish must allege that (1) she was doing substantially equal work on the job, the performance of which required substantially equal skill, effort, and responsibility as the jobs held by members of the opposite sex; (2) the job was performed under similar working conditions; and (3) she was paid at a lower wage than those members of the opposite sex. *See Smith v. Janey*, 664 F. Supp. 2d 1, 12 (D.D.C. 2009); *Nyman v. Fed. Deposit Ins. Corp.*, 967 F. Supp. 1562, 1577 (D.D.C. 1997). The District moves to dismiss Count VI under Rule 12(b)(6) on the basis that rather than sex discrimination, Cornish was paid less than male counterparts because, first, she did not perform the same work as them, and second, she was a temporary employee in the Budget and Finance Division.[6] *See* Def.'s Mem. Supp. Mot. Dismiss, ECF No. 11, at 13.

Regarding the District's first argument, Cornish alleges that she has performed job functions "that require or entail substantially the same skill, effort, and responsibility" as at least

---

[6] To the extent the District argues that Cornish's claim fails because she does not allege that other women in the Budget and Finance Division were paid less than male co-workers, it cites no statutory or judicial support for such a proposition. *See* Def.'s Mem. Supp. Mot. Dismiss, ECF No. 11, at 12-13.

three specifically-referenced men in the Budget and Finance Division, *see* 2d Amend. Compl., ECF No. 8, at ¶ 117, but she "is compensated at a JS-11 pay grade, while the [] male employees are or were compensated at higher pay grades." *Id.* ¶ 118; *see also id.* ¶ 49 (alleging that "[m]ale employees in the Budget and Finance Division who perform the same duties Ms. Cornish does, or duties less complex, are compensated at one or two pay grades higher than she"); *id.* ¶ 51 (alleging that "male workers who perform federal reconciliations alongside [Cornish] are paid at the higher JS-12 or JS-13 level"). Accepting Cornish's allegations as true and granting all reasonable inferences in her favor, the Court finds that she has provided sufficient facts showing that she performed substantially equal work that required the same skill, effort, and responsibility as the work done by male members of the division. *See, e.g.*, *id.* ¶¶ 49-52, 54, 117.

Second, the District argues that "it is without dispute that [Cornish's] assignment was intended to be temporary," and the temporary nature of the position justifies her lower pay grade. *See* Def.'s Reply Supp. Mot. Dismiss, ECF No. 22, at 10. Cornish alleges that although she began on a temporary detail in the Budget and Finance Division which was slated to last three months, *see* 2d Amend. Compl., ECF No. 8, at ¶ 57, she remained in the same position for "more than two years," including through the time of filing the complaint, *see id.* ¶ 59. Further, she alleges that though the D.C. Courts' personnel policy "authorize[s] the Executive Officer to increase the duration of employee details beyond the six months those policies presumptively establish as a maximum, no personnel policy can be construed to authorize, and none can sustain, any personnel practice that would otherwise violate the Equal Pay Act." *Id.* ¶ 119. Thus, in effect, Cornish argues that she should not be considered a "temporary" employee in the Budget and Finance Division because the allowable time for such a short-term assignment has long passed. Accordingly, there is, in Cornish's view, no permissible reason for paying her less than

male co-workers because she is similarly-situated and performs similar tasks, which plausibly suggests that she is paid less only because of her sex.

Although clearly the assignment originally was intended to be temporary, *see id.* ¶ 48, the District's argument overlooks the critical question of whether — and if so, when — the duration of Cornish's detail in the Budget and Finance Division exceeded the bounds of a temporary assignment under the personnel policy such that she must be considered a permanent employee for purposes of the Equal Pay Act. Indeed, this is exactly the theory Cornish alleges, and accepting her allegations as true, Cornish has satisfied the requirements for maintaining an Equal Pay Act claim. *See id.* ¶ 59 ("As of the filing of this complaint, more than two years later, and more than a year after Ms. Cornish's EEO complaint was decided with a ruling in her favor as described elsewhere in this Complaint, she is still 'on detail' in the Budget and Finance Division.… [T]he notion that the transfer is temporary, even if it was plausible at the outset, can no longer be sustained as a justification for declining to offer Ms. Cornish a salary commensurate with the work she is performing to the Court's ample satisfaction."); *see also* Pl.'s Mem. Opp'n Mot. Dismiss, ECF No. 19, at 33 (citing the EEOC's Equal Pay Act regulation, 29 C.F.R. § 1620.26(b), regarding temporary assignments which discusses the potential need to adjust pay when an assignment lasts more than one month because at that point the position may no longer be deemed temporary). Accordingly, the Court denies the District's motion to dismiss Count VI.

### C. Count IX: Failure to State a Claim for Breach of Contract

In Count IX, Cornish alleges that the District, by failing to discipline or dismiss Coppet and Henderson in a timely and effective manner, breached its contractual obligations under Section 600 of the D.C. Courts' personnel policy, which makes it the policy of the courts to provide equal and meritorious employment opportunities to all persons and to prohibit

discrimination in employment decisions.  *See* 2d Amend. Compl., ECF No. 8, at ¶¶ 134-36; *see also* Personnel Policy Section 600, ECF No. 11-2, Ex. 1 at 1.  The District moves to dismiss this claim on the basis that Cornish, as a public employee, had no contractual relationship with her employer on which to bring a breach of contract claim.  *See* Def.'s Mem. Supp. Mot. Dismiss, ECF No. 11, at 14.  In response, Cornish argues that the D.C. Courts' personnel policy creates enforceable contractual rights, the breach of which gives rise to a cause of action for damages against the District.  *See* Pl.'s Mem. Opp'n Mot. Dismiss, ECF No. 19, at 36-37.

Cornish, however, offers no legislative or judicial support for her assertion that the personnel policy, and Section 600 in particular, was intended to create a contractual relationship between a Superior Court employee and the District or the D.C. Courts on which a claim for breach of contract and monetary damages can rest.  *Cf.* 2d Amend. Compl., ECF No. 8, at ¶ 137 ("As a result of Defendant's breach of its contractual obligations to Ms. Cornish under [Section] 600, Ms. Cornish experienced and continues to experience significant emotional pain and suffering, for which she is entitled to appropriate financial compensation and other relief.").  Her suggestion that *Martin v. District of Columbia Courts*, 753 A.2d 987 (D.C. 2000), provides to the contrary is misguided.  In *Martin*, the petitioner, a former employee of the D.C. Courts, alleged that his termination violated the D.C. Courts' personnel policy procedures for adverse actions against court employees.  *See Martin*, 753 A.2d at 989.  After moving through the steps set forth in the personnel policy, the petitioner sought judicial review in the Superior Court, but the Superior Court held that it lacked jurisdiction to review adverse employment decisions by the D.C. Courts.  *See id.* at 990.  On appeal, the D.C. Court of Appeals reversed the Superior Court's decision and found that Congress did not intend "to foreclose judicial review of a claim that the D.C. Courts violated the procedures for removal which the Joint Committee promulgated at

Congress's direction." *Id.* at 994. The D.C. Court of Appeals therefore concluded that "[t]he Superior Court's jurisdiction … extends to claims, such as the one Martin presents, *for equitable relief from allegedly unlawful actions by public officials*." *Id.* at 991 (emphasis added).

*Martin* plainly is a case dealing only with the scope of judicial review of internal administrative action by the D.C. Courts, not a case creating a civil cause of action for breach of contract in federal district court. This Court recognized as much when, in *Chisholm v. District of Columbia*, it explained in a footnote citing *Martin*, "While it might be possible that there existed a claim for judicial review by the Superior Court of the District of Columbia of the Courts adherence to their own adopted personnel policies, that was not a claim raised by the plaintiff in this case." 666 F. Supp. 2d 96, 117 n.20 (D.D.C. 2009) (citing *Martin*, 753 A.2d at 994). The Court therefore concludes that *Martin* cannot be read as creating a civil cause of action in federal district court by an employee for breach of the D.C. Courts' personnel policy.[7] Further, Cornish provides no other legal basis for treating the personnel policy as creating a contractual relationship upon which an employee can sue the District or the D.C. Courts for breach and monetary damages. As such, the Court grants the District's motion to dismiss Count IX.[8]

---

[7] This claim likely also is precluded on a broader basis: the D.C. Comprehensive Merit Personnel Act ("CMPA") governs the workplace relationship for D.C. employees. *See* D.C. Code § 1-601 *et seq*. The CMPA, however, specifically excludes from its coverage non-judicial personnel of the D.C. Courts. *See id.* § 1-602.01(a). In the analogous context of the federal Civil Service Reform Act ("CSRA") and related federal employment statutes, the D.C. Circuit has said that "'what you get under the CSRA is what you get,'" and federal employees therefore are precluded from bringing claims on any other grounds. *Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009) (quoting *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005)). Cornish, then, likely is limited to those statutorily created employment causes of action for D.C. Courts' personnel, and she likely cannot circumvent that limit through a "breach of contract" theory.

[8] The Court notes that Cornish's suggestion about converting the claim from breach of contract to breach of the policy itself fares no better because there still would be no legal basis for asserting a cause of action for damages based on such a breach, and *Martin* held only that the Superior Court, not this Court, had jurisdiction to review claims seeking equitable relief based on

**D. Count XI: Failure to State a Claim for Negligent Infliction of Emotional Distress**

Under District of Columbia law, the elements of a claim for negligent infliction of emotional distress are: (1) the plaintiff was in a zone of physical danger, which was (2) created by the defendant's negligence, (3) the plaintiff feared for her own safety, and (4) the emotional distress so caused was serious and verifiable. *See Rice v. Dist. of Columbia*, 774 F. Supp. 2d 25, 33 (D.D.C. 2011); *Estate of Manook v. Research Triangle Inst.*, 693 F. Supp. 2d 4, 21 (D.D.C. 2010). The District moves to dismiss Cornish's claim in Count XI on the basis that the complaint does not allege negligent acts by Coppet or Henderson, but rather only intentional conduct. *See* Def.'s Mem. Supp. Mot. Dismiss, ECF No. 11, at 14-15.

In response, Cornish appears to conflate "negligence" with a lack of specific intent to cause emotional distress. *See* Pl.'s Mem. Opp'n Mot. Dismiss, ECF No. 19, at 38-39 ("Ms. Cornish does not contend that Ms. Coppet's and Ms. Henderson's actions were not intended to cause emotional distress for her. However, if a factfinder were to conclude that the two women's actions did not rise to the level of intentional infliction, it could still decide that those acts constituted negligent infliction."). But "negligence," as used in the tort, refers only to the nature of the underlying conduct that caused a plaintiff to be placed in the zone of danger. *See Rice*, 774 F. Supp. 2d at 33. "Negligence" does not refer to the unintended consequence of causing emotional stress that resulted from what originally was intentional conduct. As such, despite Cornish's suggestion to the contrary, negligent infliction of emotional distress cannot be treated as a "lesser tort" to intentional infliction of emotional distress, *see* Pl.'s Mem. Opp'n Mot. Dismiss, ECF No. 19, at 37, because each tort requires the pleading of factual circumstances and elements not required in the other, including negligent versus intentional conduct. *Cf. Cotton v.*

---

internal proceedings under the D.C. Courts personnel policy. *See* Pl.'s Mem. Opp'n Mot. Dismiss, ECF No. 19, at 37; *see also infra* Part IV.E.2 (discussing Section 600 and the DCHRA).

*Dist. of Columbia*, 541 F. Supp. 2d 195, 209 (D.D.C. 2008) (granting motion to dismiss when "[t]he allegations contained in the plaintiff's negligent infliction of emotional distress claims are identical to those supporting her claim of intentional infliction of emotional distress").

Here, although the term "intentional" is not always used explicitly, the alleged acts of Coppet and Henderson in harassing Cornish through, for example, derogatory comments or abusive behavior are clearly intentional conduct, not negligence.[9]  Without any plausible allegations of negligent conduct, Cornish fails to satisfy the basic requirement of a negligent infliction of emotional distress claim, and the Court therefore must grant the District's motion to dismiss Count XI.[10]  *See Rice*, 774 F. Supp. 2d at 33 (dismissing negligent infliction of emotional distress claim when plaintiff only alleged "deliberate disregard" and "extreme and outrageous" conduct by the offending party because those allegations described intentional, not negligent, acts); *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 759 n.9 (D.C. 2001) (stating that "since the conduct alleged, even when viewed in the light most favorable to appellant, is not negligence but an intentional tort, appellant cannot recover damages for negligent infliction of emotional distress based on that conduct").

---

[9]	*See, e.g.*, 2d Amend. Compl., ECF No. 8, at ¶ 18 ("Ms. Coppet and Ms. Henderson made a fetish of insulting, humiliating, and intimidating Ms. Cornish in front of other workers…. Ms. Coppet repeatedly yelled at Ms. Cornish when other employees were present. Ms. Henderson often hung up on her during telephone conversations, and continually interrupted her when she tried to speak."); *id.* ¶ 22 ("Ms. Coppet and Ms. Henderson regularly imposed on Ms. Cornish, late in the business day, assignments they insisted be completed that evening or by the start of the following day."); *id.* ¶ 31 ("Ms. Henderson said to other Branch workers, in a derogatory manner and within earshot of Ms. Cornish, 'Look at the way she's limping.'  On the same day, Ms. Henderson demanded of Ms. Cornish with a sneer, in the presence of other workers, 'Why [do] you walk like that?'"); *id.* ¶ 33 ("Ms. Coppet deliberately commanded Ms. Cornish to perform errands on foot, particularly to check on small details in the P&S Branch's future office space on a different floor of the courthouse[.]").

[10]	In addition to dismissing Count XI for failure to state a claim under Rule 12(b)(6), the Court, in the alternative, grants summary judgment for the District on this count because Cornish failed to comply with D.C. Code § 12-309.  *See infra* Part IV.F.

**E. Counts VII and VIII: Failure to State a Claim Under the D.C. Human Rights Act**

In Counts VII and VIII, Cornish asserts causes of action for hostile work environment and disparate treatment based on personal appearance in violation of the DCHRA, D.C. Code § 2-1401 *et seq*. The DCHRA provides that "[a]ny person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction for damages and such other remedies as may be appropriate[.]" *Id*. § 2-1403.16(a). The District moves to dismiss the DCHRA claims on the basis that the statute does not apply to Superior Court employees. *See* Def.'s Mem. Supp. Mot. Dismiss, ECF No. 11, at 19.

In response, Cornish does not explicitly argue for why the DCHRA applies to Superior Court employees, but instead she suggests that the D.C. Courts "expressly adopt[ed]" the DCHRA by enacting Section 600 of the personnel policy. *See* Pl.'s Mem. Opp'n Mot. Dismiss, ECF No. 19, 35-36. Thus, rather than directly addressing the District's argument, Cornish suggests that "[i]n the event that the Court grants the District's request as to [the] DCHRA counts, the interests of justice require leave to amend to allege the same violations under [Section] 600 itself." *Id*. at 36. For the reasons explained below, the Court concludes that the DCHRA does not apply to D.C. Courts employees, and the Court rejects Cornish's unsupported argument that Section 600 was intended to replicate the protections of the DCHRA by creating an identical private cause of action for monetary damages against the District or the D.C. Courts.

### 1. *Mapp v. District of Columbia*

As the District points out in its Notice of Supplemental Authority, *see* ECF No. 23, this Court, in an opinion by Judge Lamberth, recently addressed the exact question of whether the DCHRA applies to D.C. Courts employees. *See generally Mapp v. Dist. of Columbia*, No. CIV 13-329, 2014 WL 1664022 (D.D.C. Apr. 28, 2014). In *Mapp*, the plaintiff, a former probation

officer at the Superior Court, sued the District for discrimination under the DCHRA, and the District moved to dismiss the claim on the basis that the DCHRA does not apply to D.C. Courts employees. *See id.* at *1. The Court began its analysis with the D.C. Court Reorganization Act ("Reorganization Act"), Pub. L. No.91-358, Title I, 84 Stat. 475, which Congress enacted in 1970. The Reorganization Act

> reorganized the court system in the District of Columbia and established one set of courts in the District with Art. III characteristics and devoted to matters of national concern [and] created a wholly separate court system designed primarily to concern itself with local law and to serve as a local court system for a large metropolitan area.[11]

*Palmore v. United States*, 411 U.S. 389, 408 (1973). The *Mapp* Court then explained that in addition to establishing the Superior Court and the D.C. Court of Appeals, the Reorganization Act provided that a Joint Committee on Judicial Administration "shall have responsibility within the District of Columbia court system for … [g]eneral personnel policies, including those for recruitment, removal, compensation, and training." D.C. Code § 11-1701(b)(1). The Reorganization Act also stated that "[a]ppointments and removals of court personnel shall not be subject to the laws, rules, and limitations applicable to District of Columbia employees." *Id*. § 11-1725(b)(2).

Next, the *Mapp* Court addressed Congress's enactment of the Home Rule Act, D.C. Code § 1-207.18. *See Mapp*, 2014 WL 1664022, at *1. As the Court explained, "Congress furthered its goal of an independent local government for the District by enacting the Home Rule Act, which ceded some federal control of the city to an elected mayor and city council." *Id*. But

---

[11] As the *Mapp* Court explained, "[f]rom its inception in 1836 until 1970, the United States District Court for the District of Columbia served the dual roles of a local and federal court, 'hear[ing] and decid[ing] the full range of local common law and equitable questions, in addition to its regular calendar of federal questions and diversity actions.'" *Mapp*, 2014 WL 1664022, at *1 (quoting *Shutack v. Shutack*, 516 F. Supp. 219, 221 (D.D.C. 1981)).

Congress made clear through the Home Rule Act that the Superior Court and Court of Appeals "shall continue as provided under the District of Columbia Court Reorganization Act of 1970." D.C. Code § 1-207.18. Congress also explicitly forbade the new council from enacting "any act, resolution, or rule with respect to any provision of [the Reorganization Act] (relating to organization and jurisdiction of the District of Columbia courts)." *Id.* § 1-206.02; *Mapp*, 2014 WL 1664022, at *1.

Having established the background of the Reorganization Act and the Home Rule Act, the *Mapp* Court turned its attention to the DCHRA by explaining that the D.C. City Council enacted the law in 1977 to "secure an end in the District of Columbia to discrimination for any reason other than that of individual merit." D.C. Code § 2-1401.01. To this end, the DCHRA established the Office on Human Rights to receive, review, investigate, and mediate employment discrimination claims in the District. *See id*. § 2-1411.03(3). The DCHRA further provided that if the Office on Human Rights finds probable cause and is unable to mediate a violation, the complaint is forwarded to the Commission on Human Rights, which is an "impartial forum for the hearing and deciding of cases of unlawful discrimination in employment." *Id*. § 2-1404.02.

Finally, turning to the crucial issue of statutory interpretation, *Mapp* began with the well-established standard that "[s]tatutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985). Based on the clear language of the Reorganization Act, the Home Rule Act, and the DCHRA, the *Mapp* Court concluded, and this Court agrees, that the "statutory language is plain and unambiguous: The D.C. City Council may not regulate matters covered by the Reorganization Act, which expressly reserves management of personnel policies to the Joint Committee and

explicitly exempts appointments and removals of court personnel from regulations generally applicable to District employees." *Mapp*, 2014 WL 1664022, at *2. After rejecting the plaintiff's arguments for adopting a contrary interpretation despite the unambiguous language of the statutes, none of which Cornish raises here, the *Mapp* Court granted the District's motion to dismiss the DCHRA claims because it found that the statute does not apply to employees of the D.C. Courts. *Id.* at *3.

In the instant case, it is undisputed that Cornish is an employee of the Superior Court, thus making her similarly-situated to the plaintiff in *Mapp*. *See* 2d Amend. Compl., ECF No. 8, at ¶ 4. Cornish also provides no argument for why the *Mapp* holding is incorrect or otherwise distinguishable from the circumstances here. Accordingly, the Court agrees with the holding in *Mapp* and grants the District's motion to dismiss the DCHRA claims in Counts VII and VIII because the statute is inapplicable to court employees like Cornish.

## 2. D.C. Courts' personnel policy

The Court also must address Cornish's argument that the D.C. Courts' personnel policy, namely Section 600, was intended to mimic the DCHRA by creating an analogous civil cause of action for D.C. Courts employees. Although Section 600 includes similar language to the DCHRA about prohibiting discrimination, Cornish does not point to, and this Court does not find, any provision granting a cause of action to D.C. Courts employees for monetary damages against the District. Nor does Cornish make any argument for why such a cause of action should be inferred from the language of the policy. Further, Cornish cites no case in which a civil cause of action for damages was permitted against the District for violation of a section in the personnel policy.

The personnel policy sets forth internal procedures for the D.C. Courts to follow, and a party may, under certain conditions, seek review in the Superior Court about whether such procedures were met. *Cf. Martin v. Dist. of Columbia Courts*, 753 A.2d 987 (D.C. 2000). And just as the Court found that Cornish cannot bring a breach of contract claim premised on Section 600, it also concludes that nothing in Section 600, or in the related Section 601, grants an employee the right to sue the District or the D.C. Courts for monetary damages based on alleged employment discrimination. As such, Cornish's suggestion of amending the complaint to replace the DCHRA counts with claims for violations of Sections 600 or 601 misses the mark because such an amendment would be futile.[12] *See* Pl.'s Mem. Opp'n Mot. Dismiss, ECF No. 19, at 36.

## F. Counts VII-VIII and X-XII: Summary Judgment on Unliquidated Damages Claims due to Failure To Comply with D.C. Code § 12-309

The District moves for summary judgment on the claims for unliquidated damages in Counts VII-VIII (DCHRA), Count X (intentional infliction of emotional distress), Count XI (negligent infliction of emotional distress), and Count XII (negligent supervision) on the basis that Cornish failed to comply with the notice requirements in D.C. Code § 12-309 before filing suit. *See* Def.'s Mem. Supp. Mot. Dismiss, ECF No. 11, at 23-27. Because the Court already has found that the DCHRA does not apply, it focuses only on arguments regarding Cornish's claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and negligent supervision.

---

[12]     D.C. Courts employees are not left without a remedy for employment discrimination because, as the Court pointed out in *Mapp*, they are protected by Title VII. *See Mapp*, 2014 WL 1664022, at *3.

To support its request for summary judgment, the District argues that the complaint alleges a variety of misconduct that ended on or around April 27, 2011, which is when Cornish was transferred to the Budget and Finance Division, but Cornish sent only one § 12-309 "notice letter" on July 25, 2013. *See* Notice Letter, ECF No. 19-14, Ex. 13. The District continues that the timeframe for submitting notice about the common law claims was never tolled regardless if the Title VII claims required exhaustion. As such, the District concludes that Cornish failed to provide timely notice under § 12-309 because the six-month period expired in late 2011, and as such, her common law unliquidated damages claims are barred.

Cornish, on the other hand, sets forth a multilayered argument to justify why the July 25, 2013, notice letter was timely despite her last actual injury occurring in April 2011. *See* Pl.'s Mem. Opp'n Mot. Dismiss, ECF No. 19, at 43-49. First, relying on *Pinkney v. District of Columbia*, 439 F. Supp. 519 (D.D.C 1977), Cornish asserts that § 12-309's six-month deadline is tolled until all required administrative remedies are exhausted. Second, she argues that although the common law claims did not require exhaustion, the Title VII claims did, and as such, the tort claims must be treated as tolled while she exhausted the Title VII administrative remedies because both sets of claims arose from a common nucleus of facts. Third, Cornish argues that the Title VII administrative process was not "final" when she received the EEO letter on July 30, 2012, because that letter, which found in her favor, did not constitute "final" agency action under Section 601 of the D.C. Courts' personnel policy. *See* Personnel Policy Section 601, ECF No. 11-2, Ex. 1 at 3 (Step V(B)). Instead, because the EEO Office refused to take any "final" action after the favorable ruling, Cornish was left in limbo and decided to file an EEOC claim fifty-five days after receiving the EEO letter. *Cf.* 29 C.F.R. § 1614.401(a) ("A complainant may appeal an agency's final decision or dismissal of a complaint."). Finally, Cornish explains that under the

EEOC procedures, she was required to wait for a right-to-sue letter, which she received on April 30, 2013, when more than 180 days had passed since filing the charge. *See* Right-To-Sue Letter, ECF No. 19-13, Ex. 12 at 1. Cornish therefore concludes that she had six months from receiving the right-to-sue letter to comply with § 12-309 for both the Title VII and common law claims, which she satisfied by sending the notice letter on July 25, 2013.

### 1. Section 12-309, Policy Goals, and Strict Compliance

To resolve the parties' dispute about the timeliness of Cornish's notice, the Court starts, as it must, with the language of D.C. Code § 12-309, which provides that

> [a]n action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause and circumstances of the injury or damage.

When applying the statute, the D.C. Court of Appeals has long held that "'strict compliance with § 12-309's requirement that timely notice be given to the District is mandatory[.]'" *Enders v. Dist. of Columbia*, 4 A.3d 457, 468 (D.C. 2010) (quoting *Wharton v. Dist. of Columbia*, 666 A.2d 1227, 1230 (D.C. 1995)). Strict adherence to the timeliness requirement is demanded because § 12-309 operates as a derogation of the common law principle of sovereign immunity. *See Dist. of Columbia v. Dunmore*, 662 A.2d 1356, 1359 (D.C. 1995). As such, unlike a statute of limitations, which, for example, can be tolled through the "discovery rule," the six-month clock for purposes of calculating timeliness under § 12-309 begins from the moment the plaintiff "sustains the injury." *Id.*; *see also Brown v. Dist. of Columbia*, 853 A.2d 733, 736-37 (D.C. 2004).

Further, as the D.C. Court of Appeals has explained, the policy rationale underlying § 12-309 is to protect the District against unreasonable claims and to give reasonable notice to the District so that the facts underlying the claims may be ascertained and, if possible, deserving

claims may be settled without litigation.  *See Dist. of Columbia v. Dunmore*, 662 A.2d 1356, 1359 (D.C. 1995); *Pitts v. Dist. of Columbia*, 391 A.2d 803, 807 (D.C. 1978) ("The legislative history of Section 309 also indicates the provision was intended to encourage the prompt settlement of meritorious claims and to permit the District to conduct an early investigation of the facts and circumstances surrounding such claims.").  Indeed, the statutory predecessor of § 12-309 was enacted in 1933 to address cases in which suits were filed against the District just before the statute of limitations expired but long after the occurrence of the underlying event, a circumstance that made it "impossible for the District of Columbia to obtain evidence for use in litigation which may result."  *See* H.R. Rep. No. 2010, 72d Cong., 2d Sess. 1 (1933) (quoted and discussed in *Breen v. Dist. of Columbia*, 400 A.2d 1058, 1060 (D.C. 1979)).  "It is therefore not surprising that the language Congress chose to remedy this problem is clear and unequivocal."  *Dunmore*, 662 A.2d at 1359.  And it is for this reason that the "point in time when a cause of action accrues is immaterial for purposes of triggering the statutory notice requirement," but rather the clock begins the moment the plaintiff sustains the injury.  *Id.*; *see also DeKine v. Dist. of Columbia*, 422 A.2d 981, 985 (D.C. 1980).

Recognizing the strictness of § 12-309's timeliness requirement but cognizant of not putting an "undue burden" on litigants by requiring early notice of their causes of action before the realities of such may be fully clear, District of Columbia courts have "held that the actual content of the notice need not follow any rigid formula."  *Dunmore*, 662 A.2d at 1360.  Thus, to satisfy § 12-309, an individual's written notice only must "'disclose both the factual cause of the injury and a reasonable basis for anticipating legal action as a consequence.'"  *Kennedy v. Dist. of Columbia*, 519 F. Supp. 2d 50, 58 (D.D.C. 2007) (quoting *Powell v. Dist. of Columbia*, 645 F. Supp. 66, 69 (D.D.C. 1986)); *see also Washington v. Dist. of Columbia*, 429 A.2d 1362, 1366

(D.C. 1981). "[P]recise exactness is not absolutely essential" in terms of both the factual basis for the claims and the legal theories upon which the plaintiff may eventually seek relief. *Shaw v. Dist. of Columbia*, No. 05-1284, 2006 WL 1274765, at *7 (D.D.C. May 8, 2006) (citations omitted); *Washington*, 429 A.2d at 1365. Accordingly, "where the District is given facts that would allow it to comprehend through a reasonable investigation the circumstances underlying the claim, the notice is sufficient." *Enders*, 4 A.3d at 468 (citations omitted).

This relatively relaxed standard for the substance of the notice letter alleviates some of the risk a potential plaintiff might face by having to provide the letter within six months of the injury, including when administrative processes, such as those Cornish endured, may take much longer. Cornish fails to appreciate this factor by suggesting that § 12-309 forces a party "to shift to a litigation footing" while separately going through the administrative process. *See* Pl.'s Mem. Opp'n Mot. Dismiss, ECF No. 19, at 46. But in fact, the lax standard for the content of the notice distinguishes § 12-309 from a litigation setting in which greater specificity certainly would be expected.

### 2. Statutory Interpretation and *Pinkney v. District of Columbia*

Although both parties acknowledge that D.C. Code § 12-309 is strictly construed in favor of the District, Cornish argues that an exception exists which tolls the six-month clock whenever a potential claim against the District requires exhaustion of administrative remedies. For this proposition, Cornish relies exclusively on *Pinkney v. District of Columbia*, 439 F. Supp. 519 (D.D.C. 1977). In *Pinkney*, the plaintiff, a former employee of Federal City College, which at the time was a public institution operated by the District, challenged his dismissal based on breach of contract and other theories. *See id*. at 522. The District argued that under § 12-309, the plaintiff's claims were barred because he waited fifteen months from the time of his

dismissal to furnish notice. *See id*. at 524. The plaintiff, however, argued that "the notice requirement did not arise until after the ensuing administrative proceedings [challenging his dismissal] had fully run their course," thus giving him six months from the end of the administrative process to provide notice, which he satisfied. *Id*.

Ultimately, the district court sided with the plaintiff on the basis that

> [w]here exhaustion is a necessary condition to bringing suit, plaintiff is under a duty to provide appropriate government administrators with the first opportunity to review and pass on his claim. Not until administrative processing is finally conducted is the matter ripe for judicial intervention. And thus not until then has the matter accrued for the purpose of triggering the duty to furnish timely notice of prospective litigation.

*Id*. at 525. The *Pinkney* Court also found that tolling the notice requirement did not offend the legislative purpose of § 12-309 because the plaintiff, through the administrative process, "necessarily will alert the government to the existence of a potentially litigable dispute" and "typically will provide government officials with a detailed explanation of his grievance." *Id*. But upon closer inspection, the Court is not convinced that *Pinkney* should be followed.

First, and most importantly, nothing in the statutory language of D.C. Code § 12-309 provides that the six-month notice period should be tolled for any reason, let alone for purposes of exhausting administrative remedies. "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) (citing *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982)). The holding in *Pinkney* therefore becomes problematic because it reads an exception into the statute that clearly does not exist based on the plain language. Indeed, as was noted above, § 12-309 involves the District's waiver of its common law sovereign immunity, and statutes related to such a waiver "must be construed strictly." *Brown v. Sec'y of Army*, 78 F.3d 645, 649 (D.C. Cir. 1996)

(citation omitted). Though *Pinkney* does not directly expand the scope of the District's waiver in terms of the type of claims a party can bring, it does greatly alter the conditions under which the District has agreed to be sued, namely that the District demands notice "within six months after the injury or damage was sustained" before a lawsuit can proceed. *See* D.C. Code § 12-309.

Second, District of Columbia courts consistently have refused to read similar exceptions into § 12-309 because of the statute's unambiguous language and the need for strict construction. For example, in *Doe by Fein v. District of Columbia*, the D.C. Court of Appeals held that § 12-309 does not permit equitable tolling, like might be allowed for a statute of limitations. *See* 697 A.2d 23, 29-30 (D.C. 1997). Upon reaching its conclusion, the court explained that "[s]uch a strict interpretation of [§ 12-309] may yield an unfortunate result, but we are bound by our prior decisions, which make inexorably clear that it is the role of the legislature, not this court, to create exceptions to the statute." *Id.* at 30-31. Similarly, the same court concluded in *Gwinn v. District of Columbia* that "[i]n light of statutory language, express congressional intent and the strict interpretation attendant to statutes in derogation of the common law, … the statutory period of notice was not tolled during appellant's minority." 434 A.2d 1376, 1378-79 (D.C. 1981). And again, in *Hill v. District of Columbia*, the D.C. Court of Appeals refused to toll § 12-309 when the claimant was hospitalized for five months after being severely injured in a fire while strapped to a hospital bed undergoing treatment for alcoholism, which led him to miss the six-month deadline. 345 A.2d 867, 868-70 (D.C. 1975).

Third, though *Pinkney* relied on § 12-309's policy rationales to reach its conclusion, the Court is not persuaded that the case's holding actually satisfies those rationales as adequately as it suggests. A primary purpose of § 12-309 is "to permit the District to conduct an early investigation of the facts and circumstances surrounding such claims." *Pitts v. Dist. of*

*Columbia*, 391 A.2d 803, 807 (D.C. 1978). By allowing a claimant to delay notification until after the administrative procedure concludes, the District is denied the opportunity to investigate claims and preserve evidence for an indeterminate amount of time. *See* H.R. Rep. No. 2010, 72d Cong., 2d Sess. 1 (1933) (explaining that the statutory predecessor of § 12-309 was enacted under circumstances in which it was "impossible for the District of Columbia to obtain evidence for use in litigation" due to filings near the end of the statute of limitations); *see also Gwinn*, 434 A.2d at 1378 (refusing to toll § 12-309 while party was a minor because the statute "was purely a notice provision specifically designed to avoid, as applied to the District, the pitfalls of the statute of limitations. Prior to its passage, suits could be brought within the statute of limitations period but so long after the event giving rise to the claim that it was impossible for the District to obtain evidence for use in dealing with such claims").

Fourth, as the District points out, § 12-309 requires notice to the Mayor, not to any other District agency or administrative body. *See* Def.'s Reply Supp. Mot. Dismiss, ECF No. 22, at 17. *Pinkney* defended the exception to § 12-309 in part on the basis that "[w]here a claimant is required to pursue his administrative remedies under the exhaustion doctrine, he necessarily will alert the government to the existence of a potentially litigable dispute." *Pinkney*, 439 F. Supp. at 525. In *Pinkney*, the plaintiff was exhausting his case through the D.C. Board of Higher Education, and there was no suggestion that notice of his grievances ever found its way to the Mayor at any time before the notice letter was sent. The concern about lack of actual notice to the Mayor holds true here, where Cornish was exhausting the Title VII remedies through the D.C. Courts' administrative process and then the EEOC.

Cornish also suggests that requiring notice under § 12-309 when she already was engaged in these administrative processes would not improve actual notice to the District, but that misses

the point, as the statute — which, again, must be strictly construed in favor of the District — clearly demands notice to the Mayor, not the District at large. Thus, the Court finds that the legislative rationale behind § 12-309 is met only by strictly applying when the notice must be sent and to whom it must be delivered. Accordingly, both the clear language of the statute and the policy behind the statute require the Court to conclude that § 12-309 is not stayed while a party exhausts administrative remedies, even if those remedies are required by law. Here, Cornish suffered her last relevant injury on or around April 27, 2011, but she did not provide notice until July 25, 2013, which is well beyond the six-month timeframe. The Court therefore grants the District's request for summary judgment on the remaining unliquidated damages claims.

### 3. Alternatively, Title VII Exhaustion Does Not Stay All Related Claims

Alternatively, even if the Court accepted that § 12-309 was tolled while a claimant exhausted required administrative remedies, that does not necessarily mean that all related claims, specifically those not requiring exhaustion, are stayed simultaneously. Here, Cornish was exhausting her Title VII remedies, but she also seeks a rule tolling § 12-309 for the common law claims that arose from the same set of facts. In support, she relies principally on *Brown v. Bronx Cross Cnty. Med. Grp.*, 834 F. Supp. 105 (S.D.N.Y 1993), where the Southern District of New York held that the statute of limitations for the plaintiff's state law claims was tolled while she exhausted the Title VII administrative remedies. *Id.* at 111. The Court finds that *Brown* does not save Cornish's claims for several reasons.

First, *Brown* dealt with a statute of limitations question, not a notice provision like D.C. Code § 12-309. Given that the D.C. Court of Appeals previously has rejected applying statute of limitations doctrines to § 12-309, *see Doe by Fein v. Dist. of Columbia*, 697 A.2d 23, 29 (D.C.

1997) (refusing to apply equitable tolling to § 12-309); *Dist. of Columbia v. Dunmore*, 662 A.2d 1356, 1359 (D.C. 1995) (holding that the "discovery rule," which applies to the statute of limitations in D.C. Code § 12-301, does not apply to § 12-309), there appears to be little basis for doing so in this situation. Second, even accepting that statute of limitations cases are applicable, *Brown* is a Southern District of New York case, and though instructive, it holds no precedential value over this Court. Third, it appears that *Brown* no longer represents good law within the Second Circuit, as other district courts within that circuit, as well as the circuit court itself, have disagreed with the decision by holding that related state law claims are not tolled during the EEOC process. *See, e.g.*, *Ashjari v. Nynex Corp.*, No. 98-9411, 1999 WL 464977, at *1 (2d Cir. June 22, 1999) (holding that an EEOC complaint does not toll the statute of limitations for assault, battery, and false imprisonment claims); *Walker v. Weight Watchers Int'l*, 961 F. Supp. 32, 37 (E.D.N.Y. 1997) (refusing to follow *Brown* and holding that "[a]lthough plaintiff's State law claims arise from the same set of facts as her Title VII claims," the EEOC process did not toll the statute of limitations on those claims); *Lamb v. CitiBank, N.A.*, No. 93 Civ. 2358, 1994 WL 497275, at *8 (S.D.N.Y. Sept. 12, 1994) (finding intentional infliction of emotional distress claim distinct from Title VII and § 1983 claims, and refusing to toll the statute of limitations). Fourth, *Brown* relied in large part on the federal district court's lack of supplemental jurisdiction over the state law claims until the Title VII claim was ripe, but such a circumstance is not in play here because Cornish asserts other federal causes of action on which supplemental jurisdiction could rest.

Finally, cases in this Circuit have consistently held that exhaustion of Title VII remedies does not toll the statute of limitations for factually related claims that do not independently

require exhaustion.[13] For example, in *Carter v. District of Columbia*, this Court held that the plaintiff's § 1981 and § 1983 claims were not tolled while exhausting the Title VII administrative remedies. 14 F. Supp. 2d 97, 102 (D.D.C. 1998) (citing *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 465-66 (1975) (explaining that plaintiffs with pending EEOC charges should file their § 1981 claims and request a stay until the EEOC charges are resolved)). The Court reached the same conclusion regarding a § 1981 claim in *Peart v. Latham & Watkins LLP*, 985 F. Supp. 2d 72, 85 (D.D.C. 2013), and similarly, in *Adams v. District of Columbia* the Court held that the plaintiff's pursuit of Title VII administrative remedies did not toll the statute of limitations for his Rehabilitation Act claims. 740 F. Supp. 2d 173, 183 (D.D.C. 2010). Here, Cornish offers no reason for why a different conclusion should apply to her state law claims than that which applies to claims under other federal statutes.[14] Thus, even if the Court found that § 12-309 was tolled while exhausting the required Title VII administrative remedies, it would be

---

[13] An exception to this principle exists for related DCHRA claims, where Title VII exhaustion automatically tolls the DCHRA statute of limitations. *See, e.g.*, *Ellis v. Georgetown Univ. Hosp.*, 631 F. Supp. 2d 71, 78 (D.D.C. 2009) (explaining that the timely filing of a charge with the EEOC, of which the D.C. Office of Human Rights receives a copy under a work-share agreement between the federal and local agencies, suffices to toll the limitations for the DCHRA claim); *Ware v. Nicklin Assocs., Inc.*, 580 F. Supp. 2d 158, 164 (D.D.C. 2008) (same); *Zelaya v. UNICCO Serv. Co.*, 587 F. Supp. 2d 277, 283 (D.D.C. 2008) (same). But, as was explained above, Cornish is not covered by the DCHRA, so those claims were dismissed.

[14] In addition to the Second Circuit cases cited above, courts in several other circuits have reached a different holding than *Brown*. *See, e.g.*, *Juarez v. Ameritech Mobile Comm'ns, Inc.*, 957 F.2d 317, 322-23 (7th Cir. 1992) (rejecting argument that tolling statute of limitations on state law claims was consistent with the purpose and intent of Title VII); *Arnold v. United States*, 816 F.2d 1306, 1312-13 (9th Cir. 1987) (finding that during Title VII exhaustion process, the statute of limitations was not tolled for claims of assault, false imprisonment, and intentional infliction of emotional distress); *Kelley v. Wal-Mart Stores E., LP*, No. CIV.A. 12-554, 2013 WL 608030, at *5-6 (S.D. Ala. Feb. 19, 2013) (holding that the statute of limitations for state law claims of negligent and wanton hiring, training, and supervision was not tolled during the EEOC proceedings because the state law claims required proof of different theories and facts than Title VII claim); *Lamb-Bowman v. Del. State Univ.*, No. CIV.A. 98-658, 1999 WL 1250889, at *10 (D. Del. Dec. 10, 1999) (holding that the "statute of limitations on Plaintiff's state wrongful discharge claim was not subject to tolling during the pendency of her EEOC administrative claim").

compelled to conclude that Cornish's common law claims, which are the only remaining unliquidated claims at issue, were not tolled at the same time. Accordingly, it remains the case under this alternative theory that Cornish failed to provide timely notice under D.C. Code § 12-309.

## V.  CONCLUSION

For the foregoing reasons, the District's motion is **GRANTED IN PART AND DENIED IN PART**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 16, 2014                                    RUDOLPH CONTRERAS
                                                             United States District Judge